IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KIMBERLY R. KOTELES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Action No. 05-1061 |
| v. | ) | |
| | ) | |
| | ) | |
| ATM CORPORATION OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

CONTI, District Judge.

Pending before this court is the motion for summary judgment (Doc. No. 57) filed by

defendant ATM Corporation of America ("ATM" or "defendant"). Plaintiff Kimberley R.

Koteles ("Koteles" or "plaintiff") filed this civil action asserting claims under the Age

Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq*. ("ADEA"), the Americans with

Disabilities Act, 42 U.S.C. §§12101 *et seq*. ("ADA"), Title VII of the Civil Rights Act of 1991,

42 U.S.C. §§2000e *et seq*. ("Title VII"), and the Pennsylvania Human Relations Act, 43 PA.

CONS. STAT. §§951 *et seq*. ("PHRA"). The claims include allegations of age, gender, and

disability discrimination, hostile work environment and retaliation. Plaintiff cross-filed these

claims with the Equal Employment Opportunity Commission ("EEOC") and with the

Pennsylvania Human Rights Commission ("PHRC"). Both agencies dismissed the claims and

issued right to sue letters.

After reviewing the record, considering the briefs in support of and in opposition to the

motion, viewing all disputed facts in plaintiff's favor and drawing all reasonable inferences in

plaintiff's favor, the court concludes that no reasonable finder of fact could render a verdict for plaintiff on her claims. With respect to the claims asserted by plaintiff under Title VII, the ADA, and the PHRA for gender and disability discrimination, hostile work environment and rehabilitation, the court concludes that plaintiff failed to establish a prima facie case. With respect to plaintiff's claims for age discrimination and even assuming she had established a prima facie case for her other claims, the court concludes after considering the undisputed facts and drawing all reasonable inferences in favor of plaintiff, no reasonable jury could find that defendant's stated reason for her termination was pretextual. The court will grant summary judgment in favor of defendant.

## Factual Background

ATM is located in Coraopolis, Pennsylvania, and is in the business of providing real estate appraisal, title, and closing management services to banks and lending institutions. (Joint Concise Statement of Material Facts ("J.S.") ¶¶ 1-2.) Plaintiff is an adult female with a birth date of March 8, 1959. (Id. ¶¶ 3-4.) ATM hired Koteles in February 1998, and terminated her employment in July 2005. (Id. ¶¶ 13, 16.) At the time of her termination, plaintiff's age was 46. (Id. ¶¶ 4, 7, 8.) During her tenure at ATM, Koteles worked in a variety of clerical positions such as title typist, client advocate, and fax management team member. (Def.'s App. Ex. A, Koteles Dep. 352-66, 369, 371-81, Oct. 11, 2006.) At the time of her termination, her position was in the fax management department and she was approved to perform up to three hours per day in the appraisal review department. (J.S. ¶¶ 16, 18; Pl.'s App., Ex. 1.) The team leader of the fax management department was Jacob Koeppen ("Koeppen"). (Def.'s App. Ex. A, Koteles Dep.

381-84; Def.'s App, Ex. B, Bruner Decl. 1.) Plaintiff was one of ten fax management team members. (Def. App., Ex. B; Bruner Decl., Ex. C.) The team consisted of Koeppen, Brandon Liebler, Denise Schwarz, Jen Ainsworth, Jeremiah Schwarz, Koteles, LaTeisha Cartwright, Michael Caler, Steve Pavlick, and T.J. Gerfert. (Id.)

During her time at ATM, plaintiff received annual pay raises on February 9, 1999, January 31, 2000, February 2, 2001, February 6, 2002, February 1, 2003, March 15, 2004, and June 1, 2005. (Pl.'s App., Ex. 11.) Plaintiff received training throughout her employment at ATM with respect to various matters, including: (a) processing MPD cover sheets; (b) title typing products; (c) typing court filings related to taxes; (d) tax certifications; (e) operating ATM's telephone system; (f) typing company orders for the client advocate department; (g) dealing with rejections in fax management; and (h) obtaining assessment and property values. (Def.'s App., Ex. A, Koteles Dep. 754-80.) Plaintiff trained to process faxes, part-time, from the summer of 2004 through April 2005. (Def.'s App., Ex. B, Bruner Decl. ¶ 11.) Plaintiff trained to process faxes, full-time, during May 2005. (Id. at ¶ 12.) Generally, the training period for this scanning position is two to three weeks. (Id. at ¶ 14.) Plaintiff believes that younger employees in her department received raises or bonuses for meeting production quotas and were paid more than she was paid. (Def. App., Ex. A, Koteles Dep. 501-06, 733-36, 784.) She believes that other younger employees received more training opportunities than she did. (Id. at 754-80.)

Koteles provided evidence of various actions taken by the company and her co-workers. On February 21, 2003, plaintiff received an email from Barry Coffin ("Coffin") stating that free

beverages from the recreation center were only for those individuals who were using the recreation center and not those individuals who were passing through.  (Pl.'s App., Ex. 19.) Sharon Corrdes ("Corrdes"), another ATM employee, received a similar email.  (Id.)  On June 16, 2003, plaintiff applied for the title approver back-up program at ATM.  (Pl.'s App., Ex. 25.) Plaintiff was not chosen for the program and on June 19, 2003, ATM announced that Jamie Ambrass, Joni Brown, Melvin Cobbs, J.C. Coulter, Kim Crocker, Linda Dreshman, Darlene Ruckert, Brian Walsh, Andrew Wiggins, Joe Passante, Nile Green, and Casey Razzano were chosen for the positions.  (Def.'s App., Ex. B, Bruner Dec. ¶ 8.)  Darlene Ruckert was born on December 20, 1950.  (Bruner Decl. at ¶ 9.)  On October 8, 2003, plaintiff reported to Koeppen that she fell into her chair when she came into work as a result of someone moving the chair's position.  (Pl.'s App., Ex. 15 at 9.)  Melissa Starkey ("Starkey"), another ATM employee, reported that on the evening before plaintiff's fall, Mike Cross had moved the chair into a more comfortable position for himself.  (Id. at 8.)  In 2003, plaintiff did not receive cookies from an office party.  (Def.'s App., Ex. A-1, Koteles Dep. 555-58.)

On or about February 15, 2004, plaintiff filed a charge of age and disability discrimination and retaliation with the EEOC.  (Def.'s App., Ex. E.)  In the complaint, plaintiff claimed that she did not receive promotions and did not receive training or cross-training because of her disability and age.  (Id.)  She also claimed that she was a victim of harassment and a hostile work environment.  (Id.)  On April 29, 2005, the EEOC dismissed plaintiff's February 2004 charge.  (Def.'s App., Ex. F.)

On June 1, 2004, plaintiff informed Coffin that she had signed up for night classes and requested moving her shift up thirty minutes for six weeks to accommodate her class schedule. (Pl.'s App., Ex. 14.)  In an email dated June 1, 2004, Coffin denied plaintiff's request to move her shift.  (Id.)  In September 2004 and on another unspecified date, Corrdes and plaintiff stayed in motels due to being required to remain at work until the end of their shifts despite inclement weather.  (Pl.'s App., Ex. 19.)  Plaintiff did not submit her hotel bill from the overnight stay in September 2004 to ATM for reimbursement.  (Def.'s App., Ex. A-1, Koteles Dep. 574-77.)  On April 23, 2005, plaintiff complained to Koeppen that other team members were talking about her behind her back and mimicking her.  (Pl.'s App., Ex. 16 at 3.)  When asked for examples, Koeppen reported that plaintiff "brought up a number of non-specific examples of how she thought she was being mistreated by team members."  (Id.)  Plaintiff later claimed, but did not report, that she was being given dirty looks by the other fax management team members when she came to work late.  (Def.'s App., Ex. A-1, Koteles Dep. 652-53.)

From May 1, 2005 until July 1, 2005, plaintiff's duties as a fax management team member consisted of entering into ATM's computer system information concerning incoming faxes, and then forwarding those faxes to the correct ATM department, and scanning them into an indexing repository.  (Def.'s App, Ex. B, Bruner Decl. ¶ 10.)  Prior to training for processing faxes, plaintiff was chosen to work two to three hours per day in the appraisal review department as a clerk.  (Pl.'s App., Ex. 1 at 1.)

From January 2005 through July 2005, ATM's fax management department maintained a production requirement for fax management team members of a minimum of 150 faxes to be

processed per day, with an error rate of less than 4%. (J.S. ¶ 29; Def. App., Ex. B, Bruner Decl. ¶ 15.) Plaintiff processed, on average, twenty-three faxes per day from May 2, 2005 through June 9, 2005. (J.S. ¶ 31.) The production totals for the fax management department in June 2005 (all month) and July 2005 (first week), show that plaintiff processed 384 faxes in June, and 73 faxes in the first week of July as of July 8, 2005. (Pl.'s App., Ex. 20.) Plaintiff's highest daily production level was thirty-seven processed faxes between June 10 and June 29, 2005. (J.S. ¶ 38.) In June 2005 four other employees processed, respectively, 2,403; 3,575; 3,416 and 2,381 faxes, and in the first week of July 2005, the same four employees processed, respectively, 254; 684; 169 and 683 faxes. (Pl.'s App., Ex. 20.) Plaintiff's error rate at the beginning of June 2005 was 5.26%, and from June 10 through June 29, 2005 was 7.73%. (J.S. ¶¶ 33, 39.)

On June 9, 2005, Koteles received her annual performance evaluation in a meeting with Ryan Bruner ("Bruner"), ATM's administrative vice president, and Koeppen, ATM's fax management supervisor. (Id. ¶ 34.) The performance evaluation gave plaintiff an overall "below average" rating, and expressed a number of concerns regarding her timeliness, accuracy, need for supervision, difficulty with basic PC skills, limited knowledge of job, and low production. (Id. ¶ 35.) On June 21, 2005 plaintiff sent an email communication to Cathy Zak of ATM explaining that her "slowness" was due to "mild learning disabilities" and "mild dyslexia." (Pl.'s App., Ex. 8 at 2.) This email was referred to ATM's human resources department the same day, and emails were exchanged about having a meeting to discuss the issue. (Id. at 1-2.) The record does not reflect the outcome of the meeting or resolution of the discussion.

On June 29, 2005 Bruner and Koeppen again met with plaintiff to discuss her continuing failure to meet the production requirement of the fax management department. (J.S. ¶ 40.) At the same meeting, Bruner presented a letter to Koteles that stated:

> On June 9, 2005 Jacob Koeppen and I met with you to present to you, your annual review. In your annual review under productivity we gave you an unsatisfactory, because your production numbers are not meeting the standard set by the Fax Management department. In this meeting I advised you of the production numbers for this department are 150 faxes with less than a 4% error rate. Currently your production numbers are in the thirties with a 6.32% error rate. These production numbers are unacceptable for this department and require your immediate attention. This letter is to advise you that you [sic] production numbers need to meet the 150 standard set by this department with less than a 4% error rate. If these numbers do not improve to the standard listed above by Friday July 8, 2005 you will be subject to termination. By signing this letter you agree that your numbers are below standard and understand that you have until July 8 to increase your productivity.

(Pl.'s App., Ex. 3.) Plaintiff signed the document, after initially refusing to do so. She asserts that she did so for fear of losing her job if she did not sign. (Def.'s App., Ex. A-1 Koteles Dep. 895-96.) After June 29, 2005, plaintiff's next workday was July 6, 2005. (J.S. ¶ 48.)

Plaintiff did not request a transfer to a different department or position, but she did ask for additional time to complete the requirements. (Def.'s App., Ex. A-1, Koteles Dep. 904-08.) On July 8, 2005, Bruner and Koeppen met with plaintiff and extended the deadline for her to increase her production numbers to July 13, 2005. (J.S. ¶ 49.) Between June 30 and July 13, 2005, plaintiff processed, on average, forty-six faxes per workday, with a highest daily total of fifty-four. (Id. ¶¶ 50, 51.) ATM terminated Koteles on July 13, 2005, and its stated reason was that she had failed to meet ATM's production requirement for fax management team members. (J.S. ¶ 52, 53.) Over a month after plaintiff's discharge, on August 23, 2005, ATM hired Esther

Carpenter ("Carpenter") as a fax management team member.  Carpenter was born in 1982.  (<u>Id.</u> ¶ 54.)

On January 29, 2007, plaintiff received a letter from Laura Macie ("Macie") in human resources at ATM.  (Pl.'s App., Ex. 10.)  Plaintiff previously was informed that she needed to complete and submit an open enrollment form and provide a check for $1,602.71 for December 2006 through January 2007 for her COBRA benefits.  (<u>Id.</u>)  The letter was sent as a reminder. (<u>Id.</u>)  Plaintiff was told if she had any questions to contact Macie and an address, phone number, and email address were provided.  (<u>Id.</u>)  Plaintiff was denied access to ATM's building when she went to pay her COBRA premiums.   (J.S. ¶ 117.)

On March 1, 2000, plaintiff was diagnosed by Burt Singerman, M.D ("Singerman"), with "bipolar disorder with anxiety."  (Pl.'s App., Ex. 22 at 3).  His report indicated an answer of "yes" to the question "Is [plaintiff] able to perform the functions of [her] position within an Office environment." (<u>Id.</u>)  The report also stated that plaintiff's prognosis for return to work was "excellent."  (<u>Id.</u>)  On March 10, 2005, Singerman reported that Koteles was "not incapacitated at this time."  (Pl.'s App., Ex. 24 at 12.)  The report suggested that the disease is episodic and that possible recurrences would require absence from work.  (<u>Id.</u>)  On July 20, 2006, a neuropsychological evaluation was conducted by Dr. Heidi Neville ("Neville"), a licensed psychologist.  (Def.'s App., Ex. C, Neville Dep. 7, Nov. 7, 2006.)  In a report that Dr. Neville prepared concerning the evaluation that she conducted, Dr. Neville stated:

> Ms. Koteles describes a level of suspiciousness and mistrust in her relations with others. Such a pattern is often associated with prominent hostility and paranoia of potentially delusional proportions.  She is quite sensitive in her interactions with others

and likely harbors strong feelings of resentment as a result of perceived slights and insults. She is quick to feel that she is being treated inequitably and often holds grudges against others, even if the perceived affront is unintentional. Consistent with the constellation of suspiciousness and resentment, she is probably seen by others as being quite hostile. Working relationships with others are likely to be very strained, despite any efforts by others to demonstrate support and assistance.

. . . .

A number of aspects of Ms. Koteles' self-description suggest noteworthy peculiarities in thinking and experience. It is likely that she experiences unusual perceptual or sensory events (perhaps including full-blown hallucinations) as well as unusual ideas that may include magical thinking or delusional beliefs.

(Pl.'s App., Ex. 23 at 4.) The report recommended a workplace "that involves limited stress and limited social interaction." (Id. at 6.) During the evaluation, Koteles "indicated that she was dyslexic." (Id. at 2.) Dr. Neville described dyslexia as "a neurological condition that's related to reading where there are difficulties with reading involving reversal of letters and numbers." (Def.'s App., Ex. C, Neville Dep. 19.) Based upon the tests that she conducted, Dr. Neville, concluded that "Ms. Koteles does not meet the criteria of a learning disability." (Pl.'s App., Ex. 23 at 5.)

Koteles takes medication for her condition. She testified that with her medication, "I am fine." (Def.'s App., Ex. A, Koteles Dep. 30.) "The only time [her disability] comes out if [she is] having a severe problem at work or [she is] under severe pressure or someone is hollering at [her]. Other than that, [she is] fine. [She is] just like anybody else." (Def.'s App., Ex. A, Koteles Dep. 267.) Plaintiff testified that on medication "[I] got my condition under control, and [I] was no different than anybody else." (Def.'s App., Ex. A, Koteles Dep. 449.) She stated:

"The only way [ATM] would have known is if I told them.  I would not have manifested anything."  (Def.'s App., Ex. A., Koteles Dep. 465.)

Plaintiff timely filed complaints with the PHRC and the EEOC, claiming illegal job discrimination, harassment, and retaliation.  (Def's App., Ex. E; Pl.'s App., Ex. 27.)   Having received right to sue letters, plaintiff commenced the above-captioned action in this court.  (Compl. 2.)  In the complaint, Koteles alleges that she was subject to a continuous and ongoing hostile work environment, disparate treatment, harassment, humiliation, threats, intimidation, and discrimination based on her disabilities and perceived disabilities, age, and sex, as well as retaliation for complaining about the ongoing hostile work environment, disparate treatment, disability and perceived disability, sex, and age harassment and discrimination.  (Id. at 13a.)  On October 19, 2007, defendant renewed its motion for summary judgment initially filed on March 9, 2007.  (Def.'s Renew. Mot. Summ. J.)

## Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).

The nonmoving party must point to specific affirmative evidence in the record, rather than rely upon conclusory or vague allegations or statements.  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Concrete evidence must be provided for each element of each of a claim, and

the evidence must be such that a reasonable fact finder could find in that party's favor at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "A nonmoving party, like plaintiff, must 'designate specific facts showing that there is a genuine issue for trial.'" Orenge v. Veneman, No. 04-cv-297, 2006 WL 2711651 at *2 (W.D. Pa. 2006) (quoting Celotex, 477 U.S. at 324).

A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson, 477 U.S. at 248. In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court may consider any evidence that would be admissible at trial in deciding the merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir. 1993); Pollack v. City of Newark, 147 F. Supp. 35, 39 (D.N.J. 1956), aff'd, 248 F.2d 543 (3d Cir. 1957), cert. denied, 355 U.S. 964 (1958) ("in considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence").

## Discussion

ATM contends that it terminated Koteles due to her failure to meet an objective production standard of processing 150 faxes per day with an error rate of less than 4%. Plaintiff asserts that this stated reason is pretextual, and that ATM actually terminated her employment due to her disabilities (bipolar disorder, dyslexia, and anxiety), her age, and her gender. Plaintiff

also suggests a repeated pattern of harassing and discriminatory acts leading up to her firing whereby similarly situated younger employees, male employees, and employees without disabilities were given more promotions, training and cross-training, bonuses and raises, perks, better work assignments, and flexible hours.  Plaintiff contends that she was denied access to COBRA benefits after her termination.  Each of plaintiff's claims will be addressed.

## I.    Discrimination Claims under the ADEA, Title VII and ADA

### A.    Burden-Shifting Framework

The Supreme Court recognized that it is often difficult for a plaintiff to prove that an employer acted with conscious intent to discriminate.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  One manner in which a plaintiff can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but rather was a pretext for unlawful discrimination.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  In cases where there is no direct evidence of discrimination, the United States Court of Appeals for the Third Circuit applies the burden-shifting analysis set forth in McDonnell Douglas.  See Barber v. CSK Distrib. Servs., 68 F.3d 694 (3d Cir. 1995).  Under this analysis, a plaintiff must first establish a prima facie case of discrimination.  McDonnell Douglas, 411 U.S. at 802; Burdine, 450 U.S. at 254.

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production -- but not the burden of persuasion --  shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision.  Simpson v. Kay Jewelers Div. of Sterling, Inc., 142 F.3d 639, 644 n.5 (3d Cir. 1998).  The defendant can satisfy

this burden by offering evidence of a nondiscriminatory reason for its action.  <u>Fuentes v. Perskie</u>, 32 F.3d 759, 763 (3d Cir. 1994).  Once the defendant offers a legitimate, nondiscriminatory reason for the challenged conduct, the plaintiff has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were pretext for discrimination.  <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 410 (3d Cir. 1999).  The <u>McDonald Douglas</u> burden-shifting analysis is applied to cases under the ADEA, Title VII and ADA.

**B.      Prima Facie Case – ADEA, Title VII and ADA**

**1.      ADEA**

The ADEA and the PHRA[1] prohibit an employer from discriminating against any employee on the basis of the employee's age if the employee is over 40 years old.  29 U.S.C. §§ 623 (a), 631 (a); 43 PA. CONS. STAT. §§ 954 (h), 955 (a).  To establish a prima facie case, the plaintiff must show that (1) she is age forty or older; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by a sufficiently younger person or a younger, similarly situated employee.  <u>Simpson</u>, 142 F.3d at 644.

In this case, the evidence of record establishes a prima facie case of age discrimination relating to her termination.  Plaintiff was over forty at the time of her termination. She was at least objectively qualified for the position she held.  While she did not meet the production

---

[1] PHRA claims are analyzed consistently with claims brought under federal discrimination statutes.  In an ADEA case, the United States Court of Appeals for the Third Circuit held "that the PHRA is to be interpreted as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently."  <u>Fogelman v. Mercy Hosp., Inc.</u>, 283 F.3d 561, 567 (3d Cir. 2002).  Neither party argues here that the PHRA requires a different analysis.

requirement for the fax management department, plaintiff was employed by ATM in other clerical positions prior to her termination and had held many other positions in the company. The Court of Appeals for the Third Circuit recognized that to determine a plaintiff's qualifications for the purposes of proving a prima facie case, an objective standard is used. Sempier v. Johnson & Higgins, 45 F.3d 724, 729 (3d Cir. 1995). "'[W]hile objective job qualifications should be considered in evaluating the Plaintiff's *prima facie* case, the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to consideration of whether the employer's nondiscriminatory reason for discharge is pretext.'" Sempier, 45 F.3d at 729, (quoting Weldon v. Kraft Inc., 896 F.2d 793, 798 (3d Cir. 1990)). "'Thus, to deny the plaintiff an opportunity to move beyond the initial stage of establishing a prima facie case because he has failed to introduce evidence showing he possesses certain subjective qualities would improperly prevent the court from examining the criteria to determine whether their use was mere pretext.'" Id., (quoting Weldon, 896 F.2d at 798-99). Plaintiff met the qualification standard. With regard to the fourth element, plaintiff adduced evidence that a younger employee was hired in the fax management department after plaintiff was terminated, which raises an inference of age discrimination.

Plaintiff also makes claims of age discrimination with respect to being denied a promotion and for being denied perks, additional training, additional raises and bonuses, and flexible hours. With respect to her promotion claim for the title approver back-up program, she did not provide evidence of the age of any applicant except Darlene Ruckert who plaintiff admits is "older than Plaintiff." (Doc. No. 49.) Plaintiff provided no evidence that any other employee,

under forty or otherwise, received perks, additional training, additional raises and bonuses, better work assignments, or flexible hours. While she provides evidence of what she personally believes she did not receive and states that she believes that other *younger* employees received a benefit, this evidence is insufficient to show that individuals that were not of the protected class received a benefit that she was denied. <u>Dowling v. Citizens Bank</u>, No. 05-cv-914, 2007 WL 2752178, at *9 (W.D. Pa. Sept. 19, 2007) ("largely unsubstantiated suspicions of ageism cannot sustain [plaintiff's] burden on summary judgment."); <u>see</u> <u>Chappell v. GTE Prods. Corp.</u>, 803 F.2d 261 (6th Cir. 1986) ("Mere personal beliefs, conjecture and speculation are insufficient to support an inference of age discrimination."). Here plaintiff's beliefs about ATM's motives and actions are not sufficient to establish the fourth element of a prima facie case. For every claim of age discrimination other than her claim relating to her termination, no reasonable finder of fact could find that plaintiff established a prima facie case of age discrimination.

### 2. Title VII

Title VII was enacted to prohibit employers from discriminating against employees with respect to compensation, terms, conditions, or privileges of employment. <u>Burdine</u>, 450 U.S. at 259. To state a claim for discrimination under Title VII and the PHRA,[2] a plaintiff must show by a preponderance of the evidence that: (1) she was a member of the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action despite being qualified; and (4) the employer filled the position with an individual with qualifications similar

---

[2]    The Title VII analysis, like the ADEA analysis, applies equally to the PHRA claims. "We construe Title VII and the PHRA consistently." <u>Scheidemantle v. Slippery Rock Univ.</u>, 470 F.3d 535, 539 n.5 (3d Cir. 2006).

to the plaintiff who was not a member of the protected class.  <u>Scheidemantle v. Slippery Rock</u> <u>Univ.</u>, 470 F.3d 535, 539 (3d Cir. 2006).

With respect to plaintiff's claims of sex discrimination, plaintiff adduced evidence that she is a member of the protected class.  Objectively, she was qualified for the position as she had been working in other positions within ATM prior to her firing.  Plaintiff was fired and in another instance denied promotion.  Plaintiff admits in her brief, which is supported by the evidence of record, that "[s]ix of the ten employees whom ATM approved for the [Title Approver Back-Up] program were female. . . ."  (Pl.'s Br. at 23.)  Only four of the individuals hired for the positions were male.  Plaintiff provided no evidence of the qualifications of any individual chosen for these positions for purposes of comparison with plaintiff's own qualifications.  The only evidence provided with respect to the title approver back-up position was a list of names indicating who was chosen and an indication that plaintiff was not chosen. Plaintiff did not dispute that upon her termination, she was replaced with a female applicant. She was not replaced with an individual outside of the protected class.  Plaintiff provided no evidence that any other employee, male or otherwise, received perks, additional training, additional raises and bonuses, better work assignments, or flexible hours that plaintiff did not receive.  Hence, the evidence of record does not establish that plaintiff met element four of a prima facie case under Title VII for sex discrimination and no reasonable finder of fact could render a verdict in her favor with respect to this claim.

### 3. ADA

To prove a prima facie case of disability discrimination under the ADA and the PHRA,[3] a plaintiff must establish that she (1) is a disabled person within the meaning of the ADA; (2) is qualified to perform the essential functions of her job, and (3) has suffered an adverse employment action as a result of discrimination. Gaul v. Lucent Techs., Inc., 134 F.3d 576, 580 (3d Cir. 1998).

Under the ADA, a person has a disability if his or her impairment substantially limits one or more of the person's major life activities, if the person has a record of such impairment or if he or she is regarded as having such impairment. 42 U.S.C. § 12102(2). Major life activities are defined in the applicable regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). An individual is considered to be substantially limited if he or she is (i) unable to perform a major life activity that the average person in the general population can perform; or (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity. Id.

_____

[3] As with plaintiff's other claims, the PHRA analysis is "basically the same" as the ADA analysis, and Pennsylvania courts "generally interpret the PHRA in accord with its federal counterparts." Rineheimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002) (citations omitted).

§ 1630.2(j). In this case, plaintiff contends that she suffers from three disabilities: bipolar disorder, anxiety, and dyslexia.

While there is no question that plaintiff was diagnosed with bipolar disorder and anxiety, she did not present evidence that her impairments relating to bipolar disorder and anxiety substantially limited her in any major life activity within the meaning of the ADA. To the contrary, the evidence of record shows that her impairments did not limit her major life activities, including work. Her doctor completed a questionnaire in 2005 stating that she was not incapacitated at the time and that she was able to perform all the essential functions of her position. Plaintiff testified at her deposition that she took medication for her bipolar disease and that with the medication she functioned normally and no one would have noticed the bipolar disorder unless she discussed it with them.

With respect to dyslexia, plaintiff claims that she suffers from dyslexia, but despite her contention that it was "well-documented," plaintiff provided no evidence that she in fact has dyslexia. Plaintiff's psychologist found that plaintiff did not have a learning disability.[4] Under those circumstances, no reasonable jury could conclude that her claimed impairment of dyslexia substantially limited any major life activity or that she had a record of that claimed impairment. Plaintiff did not specifically allege that she suffers from any other disabilities and did not show that any of her named medical problems substantially limited her in any major life activity.

---

[4] It is unclear from the record whether Neville's other findings are related to plaintiff's bipolar disorder. The report is from a year after plaintiff's termination, and it is not known whether plaintiff was suffering from those issues prior to her termination.

Plaintiff did not adduce evidence that ATM regarded her as having an impairment that substantially limited her in one or more of her major life activities.  To be regarded as disabled, an individual must prove that either (1) despite having no impairment at all, the employer erroneously believed that the plaintiff had an impairment that substantially limited major life activities, or (2) plaintiff had a non-limiting impairment that the employer mistakenly believed limited major life activities.  Tice v. Centre Area Transp. Auth., 247 F.3d 506, 514 (3d Cir. 2001).  To establish that ATM believed plaintiff to be substantially limited in the life activity of "working," plaintiff must show that it regarded her "as precluded from [working] more than a particular job."  Murphy v. United Parcel Serv., Inc., 527 U.S. 516, 523 (1999).  Plaintiff failed to adduce any evidence that ATM perceived her to have a disability.  Plaintiff worked in the appraisal review department as well as the fax department and there was no showing that ATM regarded her as not being able to perform the appraisal review department job.  Only one job – a fax department team member – was implicated in plaintiff's alleged poor performance and plaintiff did not show ATM regard her as precluded from working in any other job.  Under the circumstances, no reasonable jury could find that plaintiff established a prima facie case for her claims of disability discrimination.

Plaintiff referred in her brief to the failure of ATM to transfer her to a position she could perform.  If she intended to rely on a failure-to-transfer theory to establish an ADA claim, plaintiff needed to adduce evidence that there was a "vacant, funded position available." Shapiro v. Twp. of Lakewood, 292 F.3d 356, 360 (3d Cir. 2002).  In Shapiro, the court of appeals noted:

> We stated that "in a failure-to-transfer case, if, after a full opportunity for discovery, the summary judgment record is insufficient to establish the existence of an appropriate position into which the plaintiff could have been transferred, summary judgment must be granted in favor of the defendant-even if it also appears that the defendant failed to engage in good faith in the interactive process."

Id. (quoting Donahue v. Consolidated Rail Corp., 224 F.3d 226, 234 (3d Cir. 2000); see Castellani v. Bucks County Municipality, No. 07-1198, 2008 U.S. Dist. LEXIS 66036, at *7 (E.D. Pa. Aug. 28, 2008). Having failed to present any evidence of a vacant, available position, summary judgment must be granted in favor of defendant with respect to plaintiff's claim relating to the failure to transfer her.

The only discrimination claim for which plaintiff established a prima face case is plaintiff's claim under the ADEA relating to her termination. The court, however, will assume for the purpose of argument that she also established a prima facie case for her sex and disability discrimination claims and will consider all those claims in the analysis of the next parts of the McDonnell Douglas framework.


### C.    Defendant's Business Reason

Once a plaintiff has established a prima facie case the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for reasons that are legitimate and non-discriminatory. Burdine, 450 U.S. at 254. An employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a reason that was not discriminatory for the adverse employment decision. Fuentes, 32 F.3d at 736; see generally St. Mary's Honor Ctr.

v. Hicks, 509 U.S. 502, 509 (1993). It is not necessary for the defendant to persuade the court that it was actually motivated by the reason which it offers. Burdine, 450 U.S. at 254; Bd. of Trs. of Keene State Coll. v. Sweeney, 439 U.S. 24, 25 (1978).

Defendant offered as the reason for plaintiff's termination that she was not meeting the production quota established for the fax management department. Defendant adduced evidence that plaintiff not only did not meet the quota, but processed significantly fewer faxes than her co-workers in the same department.

Recognizing that the burden on defendant is "relatively light," and defendant can satisfy this burden "by introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision. . . ." Fuentes, 32 F.3d at 763, the court is satisfied that defendant set forth a legitimate, non-discriminatory reason for plaintiff's termination and met its burden of production.

**D.    Pretext**

The last part of the analysis requires that, "[o]nce the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)." Fuentes, 32 F.3d at 763. Once the employer has stated a legitimate, non-discriminatory reason for the adverse employment action, the plaintiff in order to survive summary judgment must satisfy at least one of the two prongs articulated by the United States Court of Appeals for the Third Circuit in Fuentes:

> [T]he plaintiff must point to some evidence, direct or
> circumstantial, from which the fact-finder could reasonably either
> (1) disbelieve the employers articulated legitimate reasons; or (2)
> believe that an invidious discriminatory reason was more likely
> than not a motivating or determinative cause of the employer's
> action.

Id. at 764.

### 1.    Prong One

A plaintiff must submit evidence that could cause a reasonable fact-finder to discredit the

employer's articulated reason for the adverse employment action in order to overcome summary

judgment and bring her case to trial.  To discredit the employer's articulated reason, the plaintiff

does not need to produce evidence that necessarily leads to the conclusion that the employer

acted for discriminatory reasons, Sempier, 45 F.3d at 728, nor produce additional evidence

beyond her prima facie case.  Fuentes, 32 F.3d at 764.  A plaintiff must, however, demonstrate

such:

> weaknesses, implausibilities, inconsistencies, incoherencies [sic],
> or contradictions in the employer's proffered legitimate reasons
> [such] that a reasonable factfinder could rationally find them
> "unworthy of credence" and hence infer that the proffered
> nondiscriminatory reason "did not actually motivate" the
> employer's action. [Fuentes, 32 F.3d] at 764-65 (quoting Ezold v.
> Wolf, Block, Schorr, and Solis-Cohen, 983 F.2d 509, 531 (3d Cir.
> 1992)).

Simpson, 142 F.3d at 644.

The question asked in prong one of the Fuentes test is not whether the employer made the

best, or even a sound, business decision, it is whether the real reason for the adverse result

suffered by the plaintiff is discrimination.  Keller v. Orix Credit Alliance, 130 F.3d 1101, 1109

(3d Cir. 1997).  The court is neither permitted to get involved in the subjective business

decisions of the employer, nor set its own employment standards for the employer, unless there is evidence of discrimination. Ezold, 983 F.2d at 527. "Furthermore, the court should not examine the issue of whether the employee has skills in an area *other than that identified by the employer* as the basis for his or her termination, because the court would then be impermissibly substituting its own business judgment for that of the employer." Moorer v. Verizon Commc'ns, No. 03-1265, 2005 WL 2807140 *9 (W.D. Pa. Oct. 27, 2005), aff'd, 211 F. App'x 98 (3d Cir. 2006) (emphasis in original). "An employment decision that would create a problem under prong one will likely turn on whether the stated reason for termination is so implausible that a fact-finder could not believe it to [be] worthy of credence." Orenge v. Veneman, No. 04-297, 2006 WL 2711651, at *15 (W.D. Pa. Sept. 20, 2006); see Menta v. Cmty. Coll. of Beaver County, 428 F. Supp. 2d 365, 374 (W.D. Pa. 2006).

In the instant case, plaintiff admits that there was a production standard for the fax management department of 150 faxes a day at a 4% rate of error. The undisputed evidence shows that plaintiff did not meet the production standard for the fax management department and that her production numbers were significantly lower than other employees in her department. She also had an error rate higher than the standard. Even after being given additional time to show that she was capable of meeting the quota, plaintiff's numbers continued to be inadequate and her error rate increased.

Plaintiff offered several "inconsistencies and contradictions" in an attempt to satisfy the first prong of the Fuentes test. Plaintiff claims that her deficit numbers and error rate were caused by her part-time work in the appraisal review department. Her production numbers,

however, were far lower than 50% of the stated quota and were significantly lower than those of the other employees whose numbers were provided. The evidence does not establish that plaintiff would have met the production standard even if she had been working full-time in the fax management department.

Plaintiff argues that the department did not bring in 150 faxes a day making it impossible for her to process the minimum. Plaintiff, however, provided no evidence that the department did not bring in enough faxes for each individual to process his or her quota. Plaintiff also claims that other employees would take the easier faxes and leave her with the more difficult ones, in essence "cherry-picking" through the faxes. Once again, plaintiff provided no evidence about how the faxes were distributed in practice. Under these circumstances, no reasonable finder of fact could conclude that plaintiff provided sufficient evidence of discriminatory pretext by ATM under this prong. Plaintiff did not satisfy her burden of showing that ATM's reason was pretextual under the first prong of <u>Fuentes</u>.

### 2. Prong Two

The court must next examine the second prong of the <u>Fuentes</u> framework to determine if plaintiff presented sufficient evidence of pretext. To show that discrimination was more likely than not a cause for the employer's adverse actions, a plaintiff must point to evidence with sufficient probative force that would allow a fact-finder to conclude by a preponderance of the evidence that the protected characteristic was a motivating or determinative factor in the employment decision. <u>Simpson</u>, 142 F.3d at 644-45. Relevant evidence that could be relied on in the evaluation of this prong includes: (1) whether the employer has previously discriminated

against the plaintiff, (2) whether the employer has discriminated against other people within the plaintiff's protected class or within another protected class, or (3) whether the employer has treated more favorably similarly situated persons not within the protected class. Id. at 645.

### a. Evidence of previous discrimination against plaintiff

Plaintiff points to her termination by ATM as one instance in an alleged repeated pattern of harassing, discriminatory acts. Plaintiff argues that not being permitted to obtain a free soda, not being given a promotion, being denied bonuses, not getting cookies from an office party, being subject to the dislike of her fellow workers, and having to stay in a hotel because of inclement weather amount to a "negative synergy" implicating past discrimination on behalf of ATM. Plaintiff, however, failed to demonstrate how not obtaining free soda and cookies amounts to past discrimination. Plaintiff provided no details with regard to being denied a promotion, was unable to point to specific examples of real wrongdoing on behalf of her co-workers, and admitted that she did not turn in receipts for her hotel stays or even notified the company of those stays. Plaintiff did not present sufficient evidence of previous discrimination for a reasonable jury to find in favor of plaintiff with respect to this factor.

### b. Whether the employer has discriminated against other people within plaintiff's protected class.

On the record before the court, plaintiff did not adduce evidence that defendant discriminated against other individuals over the age of forty, other females or persons with disabilities. On the contrary, Darlene Ruckert, a woman who was born in 1950, received a title-approver back-up position. The only other evidence that plaintiff provided is that Sharron

Corrdes, another woman who is alleged to be over forty, received the same email as plaintiff

with regard to the free soda and also stayed in a hotel with plaintiff due to inclement weather.

Neither of these situations created an inference of discrimination and there is no evidence that

anyone else in a protected class was discriminated against.  Based upon the undisputed evidence

of record, viewing all disputed facts in favor of plaintiff, and drawing all reasonable inferences

in favor of plaintiff, the court concludes that a reasonable jury could not find in favor of plaintiff

with respect to this factor.

### c. Whether the employer has treated more favorably similarly situated persons not within the protected class.

Plaintiff contends that Pavlick, a male and an individual under the age of forty, was

similarly situated to plaintiff and was more favorably treated.  She argues that Pavlick was

placed in the appraisal review department and was given a bonus with a raise, whereas plaintiff

had worked in appraisal for two years and some months without a bonus or a raise.  She also

claims that Pavlick was told that he would be given a raise, bonus, and management training

while plaintiff was told that her work would be lateral.  Plaintiff was given a raise in June 2005,

approximately one month prior to her termination.  Plaintiff failed to point to evidence of record

that Pavlick received any benefits that plaintiff did not receive.  Her allegations fail to give rise

to an inference that ATM's given reason that plaintiff failed to meet the fax management

standards was pretextual and no reasonable jury could find in her favor with respect to this

factor.

Under these circumstances plaintiff did not adduce sufficient evidence, with respect to any of her discrimination claims, to show ATM's stated reason for her termination was pretextual. Summary judgment must be granted in favor of ATM with respect to plaintiff's claims for discrimination under the ADEA, Title VII and the ADA.

## II. Retaliation and Hostile Work Environment Claims

### A. Retaliation Claim

Plaintiff contends that her termination and various other acts were the result of retaliation for engaging in the protected activity of filing an earlier claim with the EEOC and complaining on several occasions to her employer. Retaliation claims brought under Title VII, the ADA, the ADEA, and the PHRA follow the McDonnell Douglas framework. Fasold v. Justice, 409 F.3d 178, 188 (3d Cir. 2005); Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 759 n.3 (3d Cir. 2004); Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989). To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) she engaged in protected activity (i.e. filing a claim with the EEOC); (2) the defendant took adverse employment actions against her, and (3) there was a causal connection between the adverse action and her protected activity. Fogelman, 283 F.3d at 567-68.

#### 1. First Element - Plaintiff Engaging in Protected Activities

It is undisputed that plaintiff engaged in protected activities satisfying the first element of the prima facie case by (i) filing the February 15, 2004 EEOC complaint, (ii) complaining to

Coffin or Koeppen that her chair was moved, her co-workers mimicked her and called her names behind her back, and (iii) requesting more time to prove she could fulfill the fax management quota because of her alleged perceived learning disability. With respect to the second and third elements of the prima facie case, the court will evaluate each allegation of a retaliatory adverse action.

## 2.    Second Element - Adverse Action

Plaintiff generally alleges that she suffered from a pattern of adverse actions. The Supreme Court, in Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53 (2006), clarified what a plaintiff must show to satisfy the second element of a retaliation claim under Title VII. The court notes that the anti-retaliation provisions of the ADEA and ADA are not materially different from those contained in Title VII. Therefore, the court will apply the Burlington Northern standard to each of plaintiff's retaliation claims. See Johnson v. McGraw-Hill Cos., 451 F. Supp. 2d 681, 710 (W.D. Pa. 2006).

In the context of a retaliation claim, a plaintiff is not required "to show an 'adverse employment action' that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him of her employment opportunities, or adversely affects his or her status as an employee.'" Moore v. City of Phila., 461 F. 3d 331, 341-42 (3d Cir. 2006) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286, 1300 (3d Cir. 1997), as an example of the former standard). In Burlington Northern, the Supreme Court distinguished the statutory language and purposes of the discrimination and retaliation provisions of Title VII and determined that the

retaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment." Burlington Northern, 548 U.S. at 62-63. The Supreme Court concluded that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." Id. at 64.

The Supreme Court articulated a new standard and held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable person from making or supporting a charge of discrimination." Id. at 65. In explaining a "materially adverse" action, the Supreme Court noted the importance of separating "significant from trivial harms" and explained:

> Title VII, we have said, does not set forth "a general civility code for the American workplace." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998); see Faragher, 524 U.S. at 788 (judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'"). An employee's decision to report discriminatory behavior cannot immunize the employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and "snubbing' by supervisors and co-workers" are not actionable under §704 (a)). The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. Robinson, 519 U.S. at 346. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. Id. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. See 2 EEOC 1998 Manual §8, p 8-13.

Id. at 68 (internal duplicate citations omitted).

Plaintiff asserts three adverse employment actions allegedly related to plaintiff reporting work-related incidences and making her EEOC claim: failure to promote, failure to relocate to another department, and termination of her employment. Plaintiff admits that she did not request a relocation to another department and instead asked for more time to learn and attempt to meet the fax management quota. The record reflects that she was given more time. There is no evidence of record that ATM's failure to relocate her was an adverse employment action. See Shapiro, 292 F.3d at 360. Plaintiff claims that she was not promoted to a title approver back-up position and that the failure to do so was in some way a retaliatory act. Although plaintiff did not adduce evidence relating to the qualifications of the individuals who were promoted to compare with her qualifications, the court will conclude that the failure to promote her is an adverse employment action. The other conduct by ATM that qualifies as an adverse employment action, for purposes of this summary judgment motion, is plaintiff's termination.

### 3. Third Element - Causal Connection

The third element requires a determination whether plaintiff presented sufficient evidence of a causal link between her protected activity and the adverse action by her employer. To establish a causal connection, plaintiff must show either temporal proximity between the protected activity and the adverse employment action, or evidence of ongoing antagonism. Abramson v. William Paterson Coll. of N.J., 260 F.3d 265, 288 (3d Cir. 2001).

With respect to the existence of a causal link between the employee's protected activity and the employer's adverse action, two main factors are relevant: (1) timing and/or (2) evidence

of ongoing antagonism. <u>Abramson v. William Patterson Coll. of N.J.</u>, 260 F.3d 265, 288 (3d Cir. 2001) ("[T]emporal proximity . . . is sufficient to establish the causal link. . . . [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.").

In the first prong, there must be a close temporal proximity between the protected activity and the adverse employment action. <u>Id.</u> While the court of appeals has not enumerated a stringent formula for what is considered to be too long of a gap between the protected activity and adverse action, the courts have held that a time span of several months is too great. <u>See Williams v. Phila. Hous. Auth.</u>, 380 F.3d 751, 760 (3d Cir. 2004) (two months too long to permit an inference of causation); <u>George v. Genuine Parts Co.</u>, No. 04-108, 2007 U.S. Dist. LEXIS 5373, at **34-35 (W.D. Pa. Jan. 25. 2007) (finding that though suggestiveness is highly sensitive to the facts of each case, a three-month gap "is not so close as to be unusually suggestive of retaliatory motive, especially where an obvious and unimpeached non-retaliatory motive exists.").

The United States Court of Appeals for the Third Circuit has been somewhat ambivalent with respect to whether timing alone is sufficient to satisfy the causation prong of the prima facie case. <u>See Woodson v. Scott Paper Co.</u>, 109 F.3d 913, 920 (3d Cir. 1997) ("Temporal proximity between the protected activity and the termination is sufficient to establish the causal link."); <u>Jalil</u>, 873 F.2d at 701 (causal link established where plaintiff discharged two days following employer's receipts of the plaintiff's EEOC claim); <u>but cf. Krouse v. American Sterilizer Co.</u>, 126 F.3d 494, 503 (3d Cir. 1997) (causation prong not established on timing alone where 19

months passed following protected activity and adverse employment action: "Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."); Quiroga v. Hasbro, Inc., 934 F.3d 497, 501 (3d Cir. 1991) (affirming lower court's determination that the timing of the plaintiff's discharge alone did not raise an inference of retaliation). Timing, however, in connection with other types of suggestive evidence, is clearly sufficient to demonstrate the causal link. Farrell, 206 F.3d at 280-81. For example, the court of appeals held that timing combined with evidence of vague or inconsistent reasons given by an employer for an employee's termination was sufficient to satisfy the causation prong of the prima facie case. Abramson, 260 F.3d at 289 ("[h]ere, as we found in our discussion of the discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in demonstrating that those reasons were vague and inconsistent."); see EEOC v. L.B. Foster Co., 123 F.3d 746, 753-54 (3d Cir. 1997), cert. denied, 522 U.S. 1147 (1998) (citing Waddell v. Small Tube Prods., Inc., 799 F.3d 69, 73 (3d Cir. 1986)).

With respect to the failure to promote adverse employment action, the selection of individuals for the title approver back-up positions was made on June 19, 2003. Plaintiff did not complain to her supervisors until October 2003 and did not file her first EEOC complaint until February 2004. Because plaintiff's complaint to her supervisor was made four months after she was denied the position and she did not file her complaint with the EEOC until four months after she complained to her supervisor, no causal connection can be drawn that plaintiff's failure to

obtain the position, which predated her activities, was somehow retaliatory for any of her protected activities.  See Emerick v. Norfolk Southern Ry., No. Civ. A.3:03-266, 2006 WL 3692595, at *4 (W.D. Pa. Dec. 12, 2006).

With respect to the termination adverse employment action, plaintiff's termination occurred on July 13, 2005, but her first complaint about her chair was on October 8, 2003. Plaintiff filed her EEOC complaint on February 15, 2004, and complained about the behavior of her co-workers to supervisors on April 23, 2005.  On June 21, 2005, plaintiff reported that she suffered from a mild learning disability.  Plaintiff's first complaint to her supervisors and the initial EEOC complaint were filed more than one year prior to the time of plaintiff's termination. Plaintiff's final complaint was filed about two and one-half months before her termination.  The timing of those actions relative to her termination "is not so close as to be unusually suggestive of a retaliatory nature" especially where plaintiff's failure to meet the production quota is "an obvious and unimpeached non-retaliatory motive. . . ."  George, 2007 U.S. Dist. LEXIS 5373, at **34-35.

Plaintiff's report of a learning disability was sent in an email about three weeks before her termination, which is a relatively short period of time.  That timing alone, however, in this case is insufficient to create an inference of causation, especially where there is an obvious motive for her termination due to her failure to meet the production quota.  See Krouse, 126 F.3d at 503 (3d Cir. 1997) ("[T]he timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred.").

The court must look to the "entire record before us" to determine whether the causation element is met, and weigh such factors as intervening antagonism, retaliatory animus, and inconsistencies in the employer's articulated reasons for the adverse employment actions. Farrell, 206 F.3d at 280-82. Plaintiff did not provide evidence of any inconsistencies in ATM's stated reason for her termination. Plaintiff received a bonus on June 1, 2005, and trained during the month of May 2005 for the fax management position. ATM rebutted any presumption of discrimination by producing evidence of its legitimate, non-discriminatory reason for terminating plaintiff. While plaintiff questioned that she should not have been accountable for a full day's quota of faxes because she may not have worked a full day, plaintiff did not dispute that her production failed to meet even half of defendant's daily requirements or that her error rate exceeded the proscribed rate. While plaintiff reported that she had a mild learning disability, she only requested more time to show that she was capable of meeting the quota, and she was given that time. As discussed above, plaintiff did not proffer sufficient evidence to discredit ATM's reason for her termination. Plaintiff failed to proffer sufficient evidence for a reasonable fact-finder to infer a causal relationship between plaintiff's protected activities and her termination. Under those circumstances, she cannot establish a prima facie case for retaliation. Even if she had established a prima facie case, she could not establish pretext for the reasons already discussed relating to her discrimination claims.

**B. Hostile Work Environment Claim**

Plaintiff alleges that she suffered from a pattern of adverse actions and that post-termination she was denied access to the ATM building to claim and pay for her COBRA

benefits.  Plaintiff alleges that the ongoing and continuous retaliations materialized into a hostile work environment.

The hostile work environment claim had its genesis in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57 (1986), in which the United States Supreme Court recognized that sexual harassment was actionable under Title VII.  In that case, the Court indicated that two types of sexual harassment claims existed under Title VII: (1) a claim based upon a *quid pro quo* arrangement; and (2) a claim based upon an intimidating, hostile, or offensive work environment.  Id. at 66.  The latter claim, more commonly known as "hostile work environment" claim, was refined in the wake of Meritor to cover other types of discrimination claims as well. See Faragher v. Boca Raton, 524 U.S. 775, 786-87 (1998).  An actionable claim of a hostile work environment requires the plaintiff to demonstrate "by the totality of the circumstances, the existence of a hostile or abusive working *environment* which is severe enough to affect the psychological stability of [an] . . . employee."  Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990) (emphasis in original).  To be ultimately successful on a claim of hostile work environment, the plaintiff must demonstrate that the harassment was severe or pervasive to such a degree that the harassment altered the terms and conditions of employment.  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 752 (1998).

The following five elements must be established by a plaintiff bringing a hostile work environment claim pursuant to Title VII: (1) the plaintiff suffered intentional discrimination because of her membership in a protected class; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would

detrimentally affect a reasonable person of the same sex or race in that position; and (5) there is

a basis for vicarious liability.  See Andrews, 895 F.2d at 1482; see also Cardenas v. Massey, 269

F.3d 251 (3d Cir. 2001); Aman v. Cort Furniture, 85 F.3d 1074, 1081 (3d Cir. 1996); West v.

Phila. Elec. Co., 45 F.3d 744, 753-54 (3d Cir. 1995).

Similar elements must be established for an ADEA hostile work environment claim.  See

Burns v. AAF-McQuay, Inc., 96 F.3d 728, 733 (4th Cir. 1996) (ADEA hostile work environment

claim scrutinized like a Title VII hostile work environment claim).

> These are the criteria for a *prima facie* claim [of a hostile work environment in an ADEA case]:
>
> 1. The employee is 40 years old or older;
>
> 2. The employee was subjected to harassment either through words or actions, based on age;
>
> 3. The harassment had the effect of unreasonably interfering with the employee's work performance and creating an objectively intimidating, hostile, or offensive work environment; and
>
> 4. There exists some basis for liability on the part of the employer.

Crawford v. Medina Gen. Hosp., 96 F.3d 830, 834-35 (6th Cir. 1996).  A hostile work

environment claim under the ADA is also analyzed like a Title VII hostile work environment

claim.  Walton v. Mental Health Assoc. of Southeastern Pa., 168 F.3d 661, 667 (3d Cir. 1999)

("A claim for harassment based on disability like one under Title VII would require a showing

that: (1) [the employee] is a qualified individual with a disability under the ADA; (2) she was

subject to unwelcome harassment; (3) the harassment was based on her disability or a request for

an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the

conditions of her employment and to create an abusive working environment; and (5) [the employer] knew or should have known of the harassment and failed to take prompt effective remedial action.").

The determination whether a plaintiff is able to establish each of the elements of a hostile work environment claim is a fact-intensive inquiry into the "overall scenario" in which the alleged harassment occurred. See Cardenas, 269 F.3d at 261 (3d Cir. 2001). "The Supreme Court has cautioned that 'conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview.'" Newring v. PNC Corp., No. 01-1973, 2006 WL 840347, *7-8 (W.D. Pa. Mar. 29, 2006) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, (1993) (citing Meritor Savings Bank v. Vinson, 477 U.S. at 67)).

Here, plaintiff did not provide adequate evidence to support her allegation of a hostile work environment for purposes of her Title VII, ADEA or ADA claims. Plaintiff alleges numerous instances of harassment as evidence of ongoing antagonism, including that: ATM failed to dismiss her (and other employees) early on one or two occasions due to inclement weather causing her to be forced to obtain a hotel room overnight; ATM refused to permit her to more her shift to accommodate a community college course; plaintiff received dirty looks from her co-workers when she came to work late; co-workers insulted and humiliated her; plaintiff was not permitted to obtain a free soda; she did not get cookies from an office party in 2003; and plaintiff was not permitted on the premises after her termination to pay her COBRA premiums.

Plaintiff is unable to establish how ATM's failure to dismiss her and others during bad weather, to permit her to move her shift, or failing to provide her free soda and cookies supports a claim of hostile work environment relating to her sex, age or alleged disability. Plaintiff's broad claims that she received dirty looks and insults from co-workers without identifying specific co-workers or specific instances of that alleged harassment amount merely to vague accusations. Weston v. Pennsylvania, 251 F.3d 420, 428 (3d Cir. 2001) ("The mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the implications of employment to implicate Title VII liability."). Simple teasing, offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. See, e.g., Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998); Oncale v. Sundowner Offshore Svcs., Inc., 523 U.S. 75, 80 (1998).

The only evidence plaintiff provided with respect to ATM and her COBRA benefits is a letter from ATM stating that she failed to pay her premiums and indicating that she needed to pay those premiums. The letter did not indicate that plaintiff needed to go to ATM to pay the premiums and plaintiff was provided a number to call and the address to which she could send the premiums. At the time that plaintiff attempted to go to ATM to pay her premiums, she was no longer an employee at ATM and they had no duty to allow her on the premises.

Plaintiff's claims of retaliation allegedly creating a hostile work environment are not sufficient to meet the standard enunciated by Supreme Court in Burlington Northern, and no reasonable finder of fact could conclude that the actions relied upon by plaintiff would "have dissuaded a reasonable worker from making or supporting a charge of discrimination."

Burlington Northern, 548 U.S. at 68.  As the Supreme Court has noted, "petty slights, minor annoyances, and simple lack of good manners will not create such deterrence." Id.  Plaintiff did not adduce sufficient evidence of a prima facie case of a hostile work environment to raise a genuine issue of material fact.  Even had she done so, she could not establish pretext for the reasons discussed previously relating to her discrimination claims.  No reasonable jury could render a verdict in favor of plaintiff with respect to her hostile work environment claims.

## Conclusion

Based upon the undisputed evidence of record, viewing all disputed facts in favor of plaintiff and drawing all reasonable inferences in favor of plaintiff the court concludes that a reasonable jury could not render a verdict in favor of plaintiff with respect to her claims under Title VII, the ADEA, the ADA, or the PHRA.  With respect to plaintiff's claims for gender, disability, hostile work environment and retaliation discrimination claims, plaintiff failed to adduce evidence to establish a prima facie case.  With respect to plaintiff's claim for age discrimination and even assuming she had established a prima facie case for her other claims, she presented insufficient evidence to establish pretext to overcome ATM's legitimate, non-discriminatory reason for the adverse employment decision.  Therefore, summary judgment must be granted in favor of defendant with respect to all plaintiff's claims.

By the Court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: September 23, 3008

cc: Counsel of Record